*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

>*Plaintiff-Appellee,*

*v.*

Nos. 06-5885/5915

DESHAUN ODENEAL (06-5885), SHANE ANDRES
(06-5915),

>*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 05-00036—Charles R. Simpson III, District Judge.

Argued: September 13, 2007

Decided and Filed: February 22, 2008

Before: MARTIN, GUY, and CLAY, Circuit Judges.

---

### COUNSEL

---

**ARGUED:** Mark Wettle, Louisville, Kentucky, James A. Earhart, Louisville, Kentucky, for Appellants. Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Mark Wettle, Louisville, Kentucky, James A. Earhart, Louisville, Kentucky, for Appellants. Terry M. Cushing, Larry E. Fentress, Monica Wheatley, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

---

### OPINION

---

GUY, J., delivered the opinion of the court, except as to the issue discussed in Section II.A.2. CLAY, J. (pp. 9-12), delivered a separate opinion on that issue, in which MARTIN, J., joined.

RALPH B. GUY, JR., Circuit Judge. Defendants Deshaun Odeneal and Shane Andres appeal from their convictions and sentences for participating in a conspiracy to distribute marijuana, heroin, and cocaine in violation of 21 U.S.C. § 846, and for possessing firearms in furtherance of their drug trafficking crimes in violation of 18 U.S.C. § 924(c). Defendants raised a number of claims on appeal, some of which need not be decided given the determination by Judge Clay, joined by Judge Martin, that the defendants established a *Batson* violation. *Batson v. Kentucky*, 476 U.S. 79 (1976). Accordingly, this lead opinion represents the decision of the court with respect to

1

Sections II.A.1., II.B.1. and II.B.2., and, for the reasons stated in the separate opinion by Judge Clay, the defendants' convictions are reversed and the cases are remanded for new trial.

**I.**

The charges in this case arose out of the execution of a series of search warrants at apartments located in Louisville, Kentucky. Police executed the first search warrant at two adjoining apartments at 1702 Lafayette Drive, on January 1, 2004. Defendant Deshaun Odeneal lived in one of the apartments, and the other was used for storage. Police seized 243.7 grams of crack cocaine, 48.5 grams of heroin, two pounds of marijuana, a loaded Smith & Wesson .32 caliber revolver, an SK5 Norinco 7.62 caliber semiautomatic assault rifle, and two Mossberg 12 gauge shotguns from the apartments. After those seizures, police began investigating a drug conspiracy involving Andres, Odeneal, and many others, all of whom had moved to Louisville from Detroit, Michigan.

The police executed a search warrant at apartments located at 1713 Bank Street on September 14, 2004. There they found and seized 40 pounds of marijuana and 1.5 kilograms of cocaine. Two female occupants of the apartments were charged in this case, entered guilty pleas, and testified at trial that Andres and Odeneal used the Bank Street apartments to package and store marijuana and cocaine.

On January 4, 2005, a search warrant was executed at 4307 Norene Lane #1, and 660 grams of marijuana, 135 grams of crack cocaine, 182 grams of cocaine, and two pistols were seized. The residents of the apartment were charged with conspiracy, pleaded guilty, and testified at trial both that the crack cocaine and the pistols belonged to Andres and that Andres regularly used the apartment to "cook" crack cocaine.

The final search warrant was executed on February 24, 2005, at 5718 Ree Drive, which was the residence of Andres and Eliana Perryman. Police seized a Beretta 9mm semiautomatic pistol and a Ruger 9mm semiautomatic pistol. Both firearms were loaded and concealed in a hidden compartment in the living room fireplace.

Andres, Odeneal, and nineteen others, were charged by indictment with conspiracy to distribute and to possess with intent to distribute 50 or more grams of cocaine base, one kilogram or more of heroin, five kilograms or more of cocaine, and an unspecified amount of marijuana, in violation of 21 U.S.C. § 846. Odeneal was charged with one count and Andres was charged with two counts of possessing firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Odeneal was charged in connection with the firearms seized at 1702 Lafayette Drive, and Andres was charged in two separate counts in connection with the firearms seized at 4307 Norene Lane and the firearms seized at 5718 Ree Drive.

After a two-week trial, the jury convicted both Odeneal and Andres of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base and one count of possessing firearms in furtherance of a drug trafficking crime. Andres was acquitted of possessing the firearms found at the Norene Lane apartment. At sentencing, the district court found that Andres had two prior felony convictions, and, as a result, that a statutory minimum of life imprisonment was required on the conspiracy conviction, to be followed by an additional 60 months on the § 924(c) conviction. Odeneal was sentenced to 235 months' imprisonment on the conspiracy conviction,[1] to be followed by a consecutive 60-month sentence on the firearm conviction.

---

[1] The Sentencing Guideline range was 235-293 months.

**II.**

Odeneal and Andres challenge the racial composition of the venire and the prosecutor's use of peremptory challenges in selecting the jury. Given the decision of the court on the latter issue, we need not address the arguments concerning the sufficiency of the evidence, the admission of evidence, or whether the district court could have imposed the 60-month firearm sentences to run concurrently with the sentences on the drug convictions. In addition to the defendants' claims regarding the venire, we also consider Andres's arguments concerning the constitutionality of a statutory life sentence and his challenges to the prior-felony enhancement.

**A.      Racial Composition of the Jury**

**1.      Racial composition of the venire**

Odeneal and Andres, both of whom are African-American, claim that their right to a jury selected from a fair cross-section of the community was violated. The venire from which the jury was chosen consisted of 66 people, only four of whom were African-American. One African-American woman served on their jury. "The Sixth Amendment requires that the jury venire from which a jury is selected represent a 'fair cross-section' of the community." *United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). We review *de novo* whether a defendant has been denied his right to a jury selected from a fair cross-section of the community. *United States v. Buchanan*, 213 F.3d 302, 308 (6th Cir. 2000).

The government agrees that African-Americans are a distinctive group within the community, but argues that defendants have not satisfied the second and third elements required for a successful challenge. Defendants presented evidence showing that in the year 2000, 18.9% of the population of the county in which the crimes were committed was African-American. The jury administrator for the Western District of Kentucky testified that the minority population in the other ten counties of that district is much lower. Defendants did not offer evidence regarding the percentage of African-Americans in the relevant judicial district, and so we are unable to conclude that the percentage of African-Americans on this venire was not fair and reasonable when compared to the percentage of African-Americans in the district.

As to the third element, which concerns the systematic exclusion of African-Americans, the jury administrator testified that individual names chosen to be placed on the "master wheel" were drawn exclusively from voter registration lists provided by the state. Defendants argue that by using voter registration lists instead of other methods, such as drivers license registrations, African-Americans are systematically excluded because African-Americans register to vote in lower proportions than other groups. Defendants' argument is not persuasive. Voter registration lists are the presumptive statutory source for potential jurors. 28 U.S.C. § 1863(b). The circuit courts are "'in complete agreement that . . . neither the Act nor the Constitution require that a supplemental source of names be added to voter lists simply because an identifiable group votes in a proportion lower than the rest of the population.'" *United States v. Test*, 550 F.2d 577, 587 n.8 (10th Cir. 1976) (omission in original) (citation omitted) (collecting cases). As we have previously held, defendants "must show more than that their particular panel was unrepresentative. *Duren* requires us to look

at the 'venires' from which 'juries' are selected, . . . and it has long been the case that defendants are not entitled to a jury of any particular composition—only to a panel from which distinctive groups were not 'systematically excluded.'" *Allen*, 160 F.3d at 1103 (quoting *Taylor*, 419 U.S. at 538). Moreover, at oral argument, defense counsel conceded that there was no evidence that African-Americans were systematically excluded from the venire.

### 2.          The prosecutor's use of peremptory challenges

The prosecutor used peremptory challenges to excuse two potential African-American jurors. Defendants objected that the prosecutor's use of those two peremptory challenges was racially motivated. The district judge questioned the prosecutor about his motives. He explained that he excused one of the jurors because she had previously been charged with a crime, and although she was not convicted, he thought she might harbor some distrust of the police. As to the other juror, juror 194, the prosecutor explained that she had previously been on a jury that returned a not-guilty verdict, and that she had requested exclusion from jury duty because she was undergoing a very stressful divorce. A white juror had been on the same jury that returned the not-guilty verdict, but the prosecutor did not strike the white juror. When the court asked the prosecutor why he did not strike the white juror, the prosecutor replied that he did not know.

The Equal Protection clause of the Fourteenth Amendment prohibits the prosecution from using racially motivated peremptory strikes. *Batson v. Kentucky*, 476 U.S. 79 (1986). A challenge to the district court's determination of a *Batson* challenge is reviewed for clear error. *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003). Once a challenge is made, the burden shifts to the proponent of the strike, in this case the prosecutor, to articulate a race-neutral explanation for the strike. *Id.* The explanation "need not be persuasive, nor plausible," so long as it is neutral. *Id.* at 599-600. Once a race-neutral explanation is made, the defendant must prove "[p]urposeful discrimination [which] may be shown by demonstrating that the proffered explanation is merely a pretext for racial motivation." *United States v. Jackson*, 347 F.3d 598, 604 (6th Cir. 2003).

"[R]eview of the district court's resolution of the ultimate issue—whether the defendant has established purposeful discrimination—is limited: '[b]ecause this determination turns largely on the evaluation of credibility, reviewing courts give the findings of the district court great deference.'" *Valentine v. United States*, 488 F.3d 325, 338 (6th Cir. 2007) (quoting *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999)), *cert. denied*, __ S. Ct. __, 2008 WL 117931 (U.S. Feb. 19, 2008) (No. 07-8640). The prosecutor's race-neutral explanation is not required to be persuasive. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). "Unless a discriminatory intent is inherent in the [strike proponent's] explanation, the reason offered will be deemed race neutral." *Id.* at 768.

Here, the prosecutor offered race-neutral explanations, which shifted the burden to the defendants to prove that the explanations were merely a pretext for discrimination. Defendants did not satisfy that burden. They focus on the fact that the prosecutor did not provide a persuasive explanation for retaining the white juror who also previously returned a not-guilty verdict. That fact is not sufficient to prove that the prosecutor's strike was pretextual because the prosecutor had two plausible, race-neutral justifications for striking juror 194. Moreover, the court's determination that race was not the ultimate motivation in striking the juror depended largely on the court's finding that the prosecutor was credible. Accordingly, I would conclude from the evidence in this record that it was not clearly erroneous for the district court to conclude that the race-neutral explanations were not merely pretext for discrimination.

**B.      Andres's Life Sentence**

    **1.      Constitutionality of the mandatory life sentence**

Andres argues that application of a mandatory life sentence violated the Eighth Amendment because it is grossly disproportionate to the offenses at issue here and would amount to retaliation for the exercise of a fundamental right to trial by jury. Andres emphasizes that he served a total of only 90 days' imprisonment for his prior drug-related convictions, and that his prior felonies did not involve any personal injury or property damage.

The Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957 (1991), forecloses Andres's argument. In *Harmelin*, the defendant was convicted in Michigan state courts for possessing more than 650 grams of cocaine, and was sentenced to a mandatory term of life in prison without the possibility of parole. *Id.* at 961. A plurality of the Court rejected the defendant's assertion that his statutorily required life term without parole was disproportionate because it was his first felony conviction. *Id.* at 994. The plurality concluded that the Eighth Amendment "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001 (citing *Solem v. Helm*, 463 U.S. 277, 288 (1983)). The plurality in *Harmelin* concluded that a life sentence for possession of 672 grams of cocaine did not violate the Eighth Amendment, even though it was the defendant's first offense.

"The Sixth Circuit has adopted the 'narrow proportionality principle' of *Harmelin*. Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000) (citation omitted). Recognizing that Andres's sentence has been vacated on other grounds, we nonetheless reject the constitutional challenge to that sentence. In light of *Harmelin*, we cannot conclude that Andres's sentence was grossly disproportionate to the crime for which he was convicted. Andres was convicted of conspiracy, and therefore he was held accountable for all the drugs seized during the course of the conspiracy: over 6 kilograms of marijuana, another 60 pounds of marijuana that Andres packaged; 378.61 grams of cocaine base (crack); 48.5 grams of heroin; and 1088.7 grams of cocaine. Moreover, Andres was described as the co-organizer or co-leader of the conspiracy. *See United States v. Hill*, 30 F.3d 48, 50-51 (6th Cir. 1994) (rejecting a defendant's argument that his life sentence for conspiracy to distribute 177.8 grams of crack cocaine was unconstitutional).

In related constitutional arguments, Andres argues that his life sentence is disproportionate to the sentences received by his codefendants. This court has held that the Constitution does not require proportionality between defendants. *United States v. Layne*, 324 F.3d 464, 474 (6th Cir. 2003). Moreover, Andres had only one codefendant with two prior felony drug convictions; but that defendant played a minor role in the conspiracy, pleaded guilty, and cooperated with the government.

Andres also argues that a statutory mandatory sentence violates the separation of powers doctrine because mandatory minimums unconstitutionally shift sentencing discretion away from the courts to prosecutors. We have flatly rejected this argument because "'the scope of juridical discretion with respect to a sentence is subject to congressional control.'" *United States v. Dumas*, 934 F.2d 1387, 1389 (6th Cir. 1990) (quoting *Mistretta v. United States*, 488 U.S. 361, 364 (1989)). *See also id.* ("Congress can constitutionally eliminate all discretion in sentencing judges by establishing mandatory sentences . . . .")

Finally, Andres claims that his sentence is unconstitutional because the judge was prohibited by the mandatory sentencing statute from considering Andres's individual circumstances. We have held, however, that there is no constitutional right to individualized sentencing in non-capital cases.

*United States v. Levy*, 904 F.2d 1026, 1035 (6th Cir. 1990); *United States v. Gardner*, 931 F.2d 1097, 1099 (6th Cir. 1991).

### 2.          Prior-Conviction Enhancement

To enhance Andres's sentence based on his prior convictions, the government was required to comply with the notice provisions outlined in 21 U.S.C. § 851.  That statute provides:

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial . . . the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon. . . . Clerical mistakes in the information may be amended at any time prior to the pronouncement of sentence.

21 U.S.C. § 851(a)(1).  The requirements delineated in § 851 are mandatory, and a district court cannot enhance a defendant's sentence based on a prior conviction unless the government satisfies the requirements.  *United States v. Williams*, 899 F.2d 1526, 1529 (6th Cir.1990) (citing *United States v. Noland*, 495 F.2d 529, 533 (5th Cir.1974)); *see also United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996) ("A prosecutor's compliance with § 851(a)(1) is simply a necessary condition to a judge's imposing an enhanced sentence on the basis of a defendant's prior convictions."). The sufficiency of a § 851 information is a question of law that we review *de novo*. *United States v. Layne*, 192 F.3d 556, 577 (6th Cir. 1999).

On February 7, 2006, the government filed a Notice of Intent to Rely Upon Prior Convictions to Increase Sentence.  Within the notice, the United States identified two previous convictions: (1) attempted possession with intent to deliver less than 50 grams of cocaine, entered on June 18, 2001, in Wayne Circuit Court, Wayne County, Michigan; and (2) possession of marijuana in an amount less than 50 pounds but more that 5 pounds, entered on March 22, 2004, in Hunt District Court, Hunt County, Texas.  Andres objects to the use of his two prior felony convictions to enhance his sentence because (1) notice of the government's intent to use the felony convictions was not filed in an information, (2) the prior felonies were not initiated by indictments, and (3) the prior felonies occurred during the time frame of the conspiracy and therefore do not constitute separate prior felonies.

#### a.          Sufficiency of the notice of intent to rely on prior convictions to increase sentence

The "Notice" in this case was not titled an "information," but that does not render the notice inadequate.  *United States v. Forest*, 355 F.3d 942, 957 (6th Cir. 2004) (holding that rendering a 851(a)(1) notice invalid because it was not titled an "information" would put form over substance). The notice fulfilled the requirements of § 851.

#### b.          Prosecution by indictment

Further, 21 U.S.C. § 851(a)(2) provides that "[a]n information may not be filed under this section . . . unless the person either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed."  Andres argues that because the notice did not indicate that he was charged by indictment for his prior offenses, those convictions could not be used to enhance his sentence.  It is clear from the plain language of the statute, however, that the indictment requirement refers to the offense which is subject to an enhanced sentenced, *i.e.*, the conspiracy charge at issue here, and not his prior convictions.

### c.     The prior felonies

The conspiracy for which Andres was convicted began in August of 1999 and continued until November 8, 2005, the date that he was charged in a superceding indictment.  Andres argues that because he committed the Texas felony during the course of the conspiracy, and the Michigan felony was finalized during the conspiracy, neither can be considered "prior" felonies.  Whether the conduct constituted separate felonies or was part of one conspiracy is a legal question that we review *de novo*.  *United States v. Murphy*, 107 F.3d 1199, 1208 (6th Cir. 1997).

We rejected an identical argument in *United States v. Hughes*, 924 F.2d 1354 (6th Cir. 1991).  There, the district court enhanced the defendant's sentence for conspiracy to distribute and conspiracy to possess with the intent to distribute cocaine because of a state felony conviction for possession of cocaine, which occurred during the time frame of the conspiracies.  We found:

> Hughes had a prior felony drug conviction which arose from a separate criminal episode, an offense that was distinct in time.  An episode is an incident that is part of a series, but forms a separate unit within the whole.  Although related to the entire course of events, an episode is a punctuated occurrence with a limited duration.  The criminal events that constitute the bases for Hughes' conviction for possession of cocaine and his subsequent conviction for conspiracy do not represent a single criminal episode.  Such events occurred at distinct times spanning a nine-month period.  The initial drug raid, which precipitated the state conviction, occurred on March 4, 1988.  The drug raid which gave rise to Hughes' conspiracy conviction occurred on December 6, 1988.  The conspiracy, alleged to have commenced on March 1, 1988, ceased more than nine months *after* the possession offense occurred and approximately three months *after* the conviction for possession of cocaine became final.  The possession of cocaine constituted one episode which concluded with the first drug raid on March 4, 1988.  In contrast, the conspiracy to possess with intent to distribute and to distribute cocaine constituted another episode that did not conclude until December 6, 1988.  While the raids occurred at the same residence and involved the same type of controlled substance, the intervening amount of time and the finality of the state felony drug conviction lead us to conclude that the twenty-year mandatory minimum was properly applied.

*Id.* at 1361-62.  The court also explained in *Hughes* that using the state conviction as a predicate offense under the federal conspiracy sentence furthered the purpose of the sentencing enhancement—to punish recidivists more severely.

The factual circumstances underlying Andres's Michigan conviction occurred before the conspiracy charged in this case; thus, we conclude that it was a separate criminal episode.  The Texas conviction is more problematic because Andres committed the crime in 2002, during the time frame of the charged conspiracy.  Specifically, on November 14, 2002, a police officer in Texas stopped a car that Andres had rented because it was speeding.  After Andres consented to a search of the vehicle, the officer found 10 pounds of marijuana.

*Hughes* makes clear that a separate criminal episode can consist of a crime involving the same type of controlled substance as charged in the conspiracy and occurring during the time frame of the charged conspiracy.  In *Hughes*, a nine-month period of time between the allegedly distinct criminal episode and the conclusion of the conspiracy convinced the court that the prior conviction should be considered a separate criminal episode.  Here, the events underlying the Texas conviction took place more than three years before the conclusion of the conspiracy, and the conviction was entered more than one year before the conclusion of the conspiracy.  Andres had an opportunity after each conviction to cease his criminal activity, but he chose to continue.

For the reasons discussed, we reject Andres's challenges to the constitutionality of a mandatory life sentence, to the § 851 notice of the intention to seek the enhancement, and the district court's determination that his two previous convictions were prior convictions for purposes of the enhancement.

## III.

The court rejects defendants' claims concerning the racial composition of the venire (II.A.1.), the constitutionality of a statutory life sentence (II.B.1.), and the validity of the prior-conviction enhancement noticed under 21 U.S.C. § 851 (II.B.2.). However, for the reasons set forth in the separate opinion by Judge Clay, the defendants' convictions are **REVERSED**, their sentences are **VACATED,** and their cases are **REMANDED** for new trial.

---

**OPINION**

---

CLAY, Circuit Judge, delivering the opinion of the Court as to the issue discussed in Section II.A.2, joined by Judge Martin. Defendants allege that the prosecutor's use of peremptory challenges in this case indicates a violation of the prohibition against the use of race in the jury selection process under *Batson v. Kentucky*, 106 S.Ct. 1712 (1986). For the reasons that follow, we conclude that Defendants have met their required burden to demonstrate a *Batson* violation.

I.

This case involves Defendants' appeal of their convictions and sentences for conspiracy to distribute marijuana, heroin and cocaine in violation of 21 U.S.C. § 846, and for possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c). On appeal, Defendants allege that the prosecutor impermissibly utilized a peremptory challenge to remove an African-American juror because of her race in violation of *Batson v. Kentucky*, 106 S.Ct. 1712 (1986).

Prior to Defendants' jury trial, 66 individuals constituted the venire panel, four of whom were African-American. During voir dire, the government utilized peremptory strikes to remove two of the four African-Americans on the panel.[1] Defendants, who are also African American, raised a *Batson* challenge to the striking of the jurors. In particular, Defendants focused on the removal of juror 194, an African-American woman. The district court then questioned the prosecutor regarding his motivation for striking juror 194. The prosecutor replied that he removed the juror because she returned a not guilty verdict in a previous trial and because she indicated on a juror questionnaire that she was going through a divorce. Defendants indicated that the prosecutor had not struck from the panel a white juror who sat on the same jury that returned a not guilty verdict. The prosecutor did not offer an explanation as to why the white juror was not removed along with the African-American juror. Defendants further argued that the prosecutor's explanation regarding juror 194's divorce was pretextual because the juror questionnaire had been submitted one year prior to the trial and therefore should have been considered outdated. Moreover, Defendants argued, juror 194 did not raise the matter of her divorce when the district court called upon prospective jurors to report any reasons why they would be unable to serve on the jury, nor was she asked about her divorce by the prosecution. The district court did not address the contention of Defendants, nor did the district court ask the prosecutor to respond. Nevertheless, the district court overruled the objection, stating

> I think that the defendant has not raised a prima facie case, but regardless, I've called upon the United States to articulate the reason for its striking the particular juror in question, number 194, and I think the United States has articulated a basis for striking 194, as opposed to 186 on the basis of the response on the juror qualifications form, which I can see.

> Obviously, the court has to look and see whether or not this is legitimate, whether or not there is, you know, pretext involved, but on the other hand, you know, we can't take the art of litigation out of trial. And I think that the government articulated a reason for striking that juror beyond her participation in the trial which there was a not guilty verdict had and the fact that the government did not strike all African Americans. There were only a few in this panel, but the government has articulated

---

[1] A third African American was struck from the jury for cause and is not the subject of this appeal.

legitimate nondiscriminatory reasons, which do not appear to be to this court pretextual so the challenge will be denied.

(J.A. at 353)  The district court proceeded to empanel a jury which included only one African American.

II.

In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the racially discriminatory use of peremptory strikes.  106 S.Ct. 1712, 1723 (1986).  To determine whether a *Batson* violation has occurred, a district court must employ a three-step analysis. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995).  First, the district court must determine whether the opponent of a peremptory strike has established a prima facie case of racial discrimination.  *Id.*  A prima facie case is established where a strike opponent shows that

> (1) he is a member of a cognizable racial group; (2) the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; and (3) these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire men from the petit jury on account of their race.

*United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999) (quoting *United States v. Hill*, 146 F.3d 337, 340 (6th Cir. 1998)).  In *Powers v. Ohio*, 499 U.S. 400, 402 (1991), the Supreme Court modified the *Batson* prima facie case to allow a defendant to raise a *Batson* violation even if he is not of the same race as the excluded juror.

Second, if a prima facie case has been established, "the burden of production shifts to the proponent to come forward with a race-neutral explanation." *United States v. Mahan*, 190 F.3d 416, 425 (6th Cir. 1999).  A race-neutral explanation means just that, "an explanation based on something other than the race of the juror."  *Hernandez v. New York*, 500 U.S. 352, 360 (1991).  As the Supreme Court noted in *Purkett v. Elem*, the prosecutor's race-neutral explanation need not be "persuasive, or even plausible."  514 U.S. at 768.  Nevertheless, "[a] *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Miller-El v. Dretke*, 125 S.Ct. 2317, 2332 (2005).  Rather, "the prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising his challenges." *Batson*, 106 S.Ct. at 1724 n.20 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 258 (1981)).

Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett,* 514 U.S. at 767.  In making this determination, the trial court must assess the plausibility and persuasiveness of the proffered race-neutral explanation based on the totality of the evidence before the trial court. *Dretke*, 125 S.Ct. at 2332 (2005).  Although the trial court must decide the question of discriminatory intent, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768.  The party opposing a strike may meet this burden by demonstrating that the proffered race-neutral explanation is pretextual. *McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001).

On direct review, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous. *Hernandez*, 500 U.S. at 364; *United States v. Copeland*, 321 F.3d 582, 599 (2003) ("We review a district court's determination of a *Batson* challenge with great deference, under a clearly erroneous standard." (internal citations omitted)).  Deference, however, "does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief." *Miller-El v. Cockrell,* 537 U.S. 322, 341 (2003).  Indeed, this Court's review need

not be abject, particularly in light of the fact that "the harm inherent in a discriminatorily chosen jury inures not only to the defendant, but also to the jurors not selected because of their race, and to the integrity of the judicial system as a whole." *Harris*, 192 F.3d at 587-88.

III.

In the instant case, the prosecution came forward with a race-neutral explanation when called upon to do so by the district court. However, once the burden shifted back to Defendants, the district court clearly erred in concluding that the proffered race-neutral explanation was not pretextual. In particular, the district court erred in failing to fully consider the evidence of pretext presented by Defendants as part of its duty to consider the plausibility and persuasiveness of the race-neutral explanation based on the totality of the circumstances surrounding the strike. Had the district court done so, it would have found that the prosecutor's purported explanations smacked of pretext, thus proving the discriminatory use of the peremptory strike.

Indeed, the prosecutor's explanations would have been revealed as pretextual had the district court engaged in an adequate comparison between juror 194 and the similarly situated white juror who was seated. As the Supreme Court noted in *Miller-El v. Dretke*, 125 S.Ct. 2317 (2005), a district court's consideration of the totality of the circumstances surrounding a strike should include consideration of the prosecutor's stated reasons as well as a comparison between the affected juror as well as others who went unchallenged. "If a prosecutor's proffered reason for striking a black panelist equally applies to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Id.* at 2325. Proper application of a "comparative juror analysis" bears this point out.

The prosecutor purported to exclude juror 194 from Defendants' jury because she was a member of a previous jury that rendered a not guilty verdict in a "gun case." (J.A. at 350) The prosecution, however, retained a white juror who had sat on the same jury as juror 194, and also voted for acquittal. When asked about the discrepancy between the two similarly situated jurors, the prosecutor could provide no explanation regarding why juror 194 was excused and why the white juror was asked to remain. Presumably, the presence of the two jurors on the jury would have raised the same concerns on the part of the prosecutor, and yet they were treated differently. This unexplained disparate treatment established that the prosecutor's explanation was pretextual and therefore satisfied Defendants' burden under *Batson*.

The pretext revealed by the "comparative juror analysis" that should have been employed by the district court is not undermined by the fact that juror 194 and the white juror who was seated are not "similarly situated" in all respects. As the Supreme Court noted in *Miller El v. Dretke*, a "per se rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." 125 S.Ct. at 2329 n.6. In *Dretke*, the Supreme Court found an African-American juror who supported the death penalty but was peremptorily struck by the prosecution in a capital case to be similarly situated to whites who expressed similar views. *Id.* The Supreme Court reached this conclusion notwithstanding the fact that there were "some differences" between the African-American juror and similarly situated whites. *Id.* at 2329. There, an African-American juror who expressed particular views about the death penalty also had a brother who had previously been convicted of a crime. Although both the juror's views and his brother's conviction were cited as race-neutral reasons for his dismissal, the Supreme Court nonetheless found the juror to be similarly situated to white jurors who expressed the same views of the death penalty yet were allowed to remain on the jury. *Id.* at 2328-29. Similar to *Dretke*, "[n]othing in the combination of [juror 194's prior verdict and her divorce] discredits our grounds for inferring that these purported reasons were pretextual." *Id.* at 2329 n.6.

Moreover, had the prosecutor been truly concerned about juror 194's ability to focus on the proceedings because of her divorce, "we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike." *Dretke*, 125 S.Ct. at 2327. The failure of the prosecution to inquire regarding a reason purported to be a basis for a juror's dismissal serves as evidence of discrimination. *See Dretke*, 125 S.Ct. at 2328 (noting that prosecution asked no questions regarding dismissed African-American juror's brother who had been convicted of a crime, despite claiming that brother's conviction was the basis for the strike); *Mahan*, 190 F.3d at 425 (finding a strike proponent's race-neutral explanation pretextual where proponent did not ask the prospective juror about the purported reasons for the strike). Indeed, "failure to ask undermines the persuasiveness of the claimed concern." *Dretke*, 125 S.Ct. at 2330 n.8.

The fact that the prosecutor did not strike a white juror who was also on the same jury that rendered an acquittal in an earlier trial, combined with the fact that the prosecutor did not ask juror 194 any questions regarding her family life despite a purported concern regarding her ability to focus on the trial, supports the "conclusion that race was significant in determining who was challenged and who was not." *Dretke*, 125 S.Ct. at 2332.

IV.

Upon review of the entire record, we are left with a firm conviction that the district court erred with respect to the conclusion reached concerning the use of race in the jury selection process. Accordingly, the judgment of the district court is **REVERSED** with respect to Defendants' *Batson* claim and the case **REMANDED** for a new trial.