**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0498n.06**

**No. 19-4264**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Aug 25, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ANDRE J. HUNT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| FRANK SUNQUIST; MARK ASHCRAFT, | ) | OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: GIBBONS, GRIFFIN, and THAPAR, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Andre Hunt, initially *pro se* but with appointed counsel for trial, brought claims under 42 U.S.C. § 1983. Hunt, a pre-trial detainee at Ashtabula County Jail, alleged that correctional officer Frank Sunquist used excessive force in escorting him from his cell to an interview room and that correctional officer Mark Ashcraft failed to intervene to stop Sunquist's use of excessive force. The district court granted Ashcraft's Federal Rule of Civil Procedure 50 motion for judgment as a matter of law, and a jury found for Sunquist on the excessive force claim. On appeal, Hunt argues that the district court erred in overruling his counsel's *Batson* challenge and granting Ashcraft's motion for judgment as a matter of law on the failure to intervene claim. We disagree and affirm the district court's judgment.

I.

Hunt was a pre-trial detainee at the Ashtabula County Jail on July 6, 2015. Hunt decided to flood his cell after he was denied the ability to use the phone to call his family because he had

been in an altercation with another inmate. By blocking the sink and toilet, Hunt was able to accumulate between a quarter inch to an inch of water on the floor of his cell.

Correctional officers Sunquist and Ashcraft responded to the call concerning the flooding. Outside Hunt's cell, Ashcraft pointed a taser at or near Hunt and directed him to lay on the floor. Hunt initially responded "fuck you" but, after Ashcraft's second instruction, Hunt proceeded to lie on the floor. Sunquist entered the cell, pulled Hunt by his ankles into the middle of the floor, put a knee on Hunt's back to control him, and proceeded to handcuff Hunt by grabbing Hunt's hand and "pull[ing] it in behind him." DE 111, Trial Tr., PageID 1804, 1810, 1829–30. Hunt testified that Sunquist pushed his head in the water twice effectively "drowning" him while he was handcuffed. DE 110, Trial Tr., PageID 1607.

Sunquist lifted Hunt up by his collar and handcuffs and proceeded to transport Hunt to an interview room on a different floor. To exit the inmate area, Hunt and Sunquist needed to pass through a sally-port door, a metal door used to lock down the cell pod. The door was partially open, and Hunt testified that Sunquist used his body to open the door by pushing him into it. Ashcraft saw Sunquist push Hunt into the door.

In the elevator down to the interview room, Sunquist had Hunt face the back corner of the elevator as required by the jail's protocol. Ashcraft asked Hunt why he flooded his cell. Hunt attempted to turn to respond to Ashcraft's question, but Sunquist forced Hunt's body back into the corner of the elevator and told him to "shut the fuck up." DE 69, Joint Stipulation, PageID 339; DE 111, Trial Tr., PageID 1681, 1687, 1716 1821–33, 1842.

Sunquist then directed Hunt down the hallway into an interview room. Hunt was seated at a bench, and Ashcraft knelt to shackle Hunt's ankles to the bench. Hunt testified that Sunquist put his hands around Hunt's neck choking him and stated, "you kick my partner and I am going to

fucking kill you." DE 69, Joint Stipulation, PageID 339; DE 110, Trial Tr., PageID 1618. Ashcraft confirmed that he saw Sunquist's hands around Hunt's neck and saw Sunquist remove his hands from Hunt's neck. Sunquist testified that he "put [his] hand at [Hunt's] shoulder and his neck" and warned Hunt that "you kick my partner, I will fucking kill you" because Hunt's body language suggested that Hunt was going to try to kick Ashcraft while Ashcraft was shackling his feet. DE 111, Trial Tr., PageID 1805–06.

In total, the escort lasted approximately two and a half minutes from the point Sunquist and Ashcraft arrived at Hunt's cell to the time they left Hunt in the interview room. Sunquist was fired from the Ashtabula County Sheriff's Department as a result of the uses of force and was criminally charged with three counts of assault and two counts of dereliction of duty. Sunquist pled guilty to one count of assault, and the other charges were dropped.

Hunt filed § 1983 claims alleging Sunquist used excessive force and Ashcraft failed to intervene in violation of the Fourteenth Amendment. The district court denied Ashcraft's and Sunquist's motions to dismiss and Ashcraft's motion for summary judgment.

Jury selection began November 18, 2019. The venire was composed of twenty-seven jurors, including four African American jurors. One African American juror, juror 14, was struck for cause. Ashcraft and Sunquist used their preemptory strikes to strike the three other African American jurors, jurors 7, 17, and 18. Hunt raised a timely *Batson* challenge to these preemptory strikes.

The district court first explained the *Batson* framework. In support of his prima facie case, Hunt's counsel first argued that the jurors were all African Americans and belonged to the same protected class at Hunt. Additionally, Hunt's counsel pointed to the pattern of strikes eliminating

all African American jurors from the venire and the difference in defendants' voir dire questioning of the African American and white jurors.

Sunquist's counsel used preemptory challenges for jurors 7 and 18. Sunquist's counsel explained that he decided to strike juror 7 because her uncle was the Warden of the Cuyahoga County Jail for about forty years and was currently under indictment. Further, juror 7 "equivocat[ed]" on "whether she could [be impartial] or not;" "[s]he felt that her uncle's situation influenced her ability to be fair and impartial in that." DE 109, Trial Tr., PageID 1549. Sunquist's counsel also represented the Ohio Patrolman's Benevolent Association, which represented Cuyahoga County correctional officers in a "somewhat adversarial situation" with the warden and management. Regarding juror 18, Sunquist's counsel stated that he was struck because he had one child formerly incarcerated and one child currently incarcerated; he allegedly "assaulted a child that was within his care or within his responsibility"; and he stated that he did not know "whether those circumstances affected his ability to be fair and impartial." *Id.* at 1550.

Ashcraft's counsel peremptorily struck juror 17. Ashcraft's counsel explained that juror 17 was struck because she had worked as a contract nurse in the Cuyahoga County jail and counsel "didn't want her to bring her preconceived notions to the rest of the jury based on her job, and no other juror had experience working in the jail setting." *Id.* at 1551.

In rebuttal, Hunt's counsel argued that neither Ashcraft nor Sunquist asked follow-up questions of jurors 7 or 17 and Ashcraft's counsel did not make any attempt to inquire into juror 17's preconceived notions. Further, Hunt's counsel asserted that both juror 7 and 17 unequivocally stated that they could be fair and impartial. Regarding juror 7's relationship with her uncle, Hunt's counsel noted that juror 7 "did mention during the venire process that she did not talk to her uncle about his dealings as warden of the jail[,] . . . [s]o there is really no indication there that her

relationship with her uncle would weigh on her in any way." *Id.* at 1552. Finally, Hunt's counsel suggested that the facts Sunquist pointed out "seemed that they would indicate this juror would be favorable for the [d]efendants." *Id.*

After hearing the arguments, the district court concluded "the [d]efendants have offered race neutral explanations that overcome the primary—the prima face case of discrimination, and therefore, the jury will be seated as announced." *Id.* Trial proceeded with the jury as announced.

At the close of evidence, both Sunquist and Ashcraft orally moved for judgment as a matter of law under Federal Rule of Civil Procedure 50. The district court denied Sunquist's motion concluding that "the evidence in this case has created genuine disputes of material fact with respect to excessive force and proximate cause." DE 112, Trial Tr., PageID 1864. Ashcraft argued that judgment as a matter of law was warranted because Hunt failed to provide a sufficient evidentiary basis from which a jury could find Ashcraft had an opportunity and the means to stop Sunquist's excessive force because each instance of force lasted only a few seconds. The district court agreed with Ashcraft that "a reasonable jury could not conclude that there was a realistic opportunity [for Ashcraft] to intervene and prevent harm" and granted the motion. *Id.* at 1871.

The excessive force claim against Sunquist was submitted to the jury, which found in Sunquist's favor. Hunt timely appealed.

## II.

## A.

Hunt's first argument is that the district court erred in overruling his *Batson* challenge to Ashcraft's and Sunquist's preemptory strikes of the three remaining African American jurors in the venire. He contends that the district court prematurely rejected his *Batson* challenge by accepting Ashcraft's and Sunquist's counsels' race neutral reasons for the preemptory strikes and

5

that he successfully rebutted the defendants' neutral reasons for striking the three African American jurors. We disagree and hold the district court's acceptance of the race-neutral explanations by Ashcraft and Sunquist regarding the use of the preemptory strikes was not clearly erroneous.

1.

"A district court's ruling on whether the exercise of a peremptory challenge violates equal protection is entitled to 'great deference,' and therefore [the court] 'may not disturb its judgment unless it is clearly erroneous.'" *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 780 (6th Cir. 2003) (quoting *McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001)); *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008))).

"The trial court is . . . best situated to determine 'whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the [striking party].'" *Drain v. Woods*, 595 F. App'x 558, 572 (6th Cir. 2014) (quoting *Snyder*, 552 U.S. at 477). "[T]he best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U.S. at 477 (alternation in original) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion)).

2.

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder*, 552 U.S. at 478). *Batson v. Kentucky* created a three-step framework to determine whether a juror has been struck for a discriminatory purpose. 476 U.S. 79, 86–89 (1986). First, the opponent of the strike "must

make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94). Second, once an opponent has made out a prima facie case, "the 'burden shifts to the [striking party] to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Id.* (quoting *Batson*, 476 U.S. at 94.) "Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam)). "Throughout the *Batson* inquiry, the ultimate burden of persuasion always rests with the party challenging the strike . . . ." *United States v. Whiteside*, 747 F. App'x 387, 395 (6th Cir. 2018) (citing *McCurdy*, 240 F.3d at 521).

"[I]n considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 478 (citing *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005)). There are multiple ways a party challenging a preemptory strike can show the other party was likely motivated in substantial part by a discriminatory intent. The party challenging the strike may point to a pattern of strikes used to target a specific racial group. *See, e.g.*, *Flowers*, 139 S. Ct. at 2246; *Miller-El*, 545 U.S. at 241; *Batson*, 476 U.S. at 97. Additionally, a party may perform a comparative analysis of jurors struck to those similarly situated. *See, e.g.*, *Snyder*, 552 U.S. at 479–84; *Purkett*, 514 U.S. at 768. Disparate questioning or contrasting questioning of jurors may also support a conclusion that the nondiscriminatory explanation provided was pretextual. *See, e.g.*, *Miller-El*, 545 U.S. at 255–58.

The first two steps of *Batson* are not at issue. Hunt timely raised a *Batson* challenge to the preemptory strikes and supported his prima facie case by emphasizing the pattern of striking all three remaining African American jurors and the disparate questioning of these jurors. Hunt

provided evidence supporting a prima facie case of discrimination, an issue that is now moot, *United States v. McAllister*, 693 F.3d 572, 579 (6th Cir. 2012), and the defendants provided race-neutral explanations for the preemptory strikes. At issue in this case is step three, where the district court is required to consider "all of the circumstances that bear upon the issue of racial animosity." *Snyder*, 552 U.S. at 478.

Hunt's first claim of error is that the district court failed to complete the third step of the *Batson* framework. Specifically, Hunt argues that the district court accepted Ashcraft's and Sunquist's counsels' race-neutral reasons on their face without weighing all the evidence and determining the persuasiveness of the justifications. Here, the district court heard the race-neutral explanations provided by Ashcraft's and Sunquist's counsels and provided Hunt an opportunity to rebut the explanations prior to finding that Ashcraft's and Sunquist's race neutral explanations overcame the prima facie case of discrimination. The district court did not perfunctorily accept Ashcraft's and Sunquist's counsel's race-neutral reasons for the preemptory strikes. Instead, the court allowed Hunt the opportunity to rebut the explanations and made a factual determination after the conclusion of the arguments. Although the district court could have more fully explained why it was convinced by defendants' race-neutral explanations, it was not required to do so. *See Miller-El*, 537 U.S. at 347. Contrary to Hunt's argument, the district court did not truncate the *Batson* analysis or combine steps two and three. *See McAllister*, 693 F.3d at 581; *United States v. Cecil*, 615 F.3d 678, 686 (6th Cir. 2010) ("Though it initially appeared to accept the government's proffered race-neutral justification at face value, the district court then heard additional argument and made its own findings with respect to the plausibility of the government's explanation."). The district court fulfilled its obligation to perform all three *Batson* steps and make a factual finding with respect to the plausibility of the race-neutral explanations.

Hunt also challenges the district court's conclusion that the totality of the evidence did not support a finding of discrimination. Ashcraft and Sunquist used their preemptory strikes to remove jurors 7, 17, and 18, all African Americans. Ashcraft responded that he excluded juror 17 because she worked as a contract nurse in the Cuyahoga County jail and counsel "didn't want her to bring her preconceived notions to the rest of the jury." DE 109, Trial Tr., PageID 1551. Sunquist's counsel explained that he excluded juror 7 because (1) her uncle was the former Warden of the Cuyahoga County jail; (2) she equivocated on whether she could be impartial; and (3) Sunquist's attorney represented correctional officers through the Ohio Patrolman's Benevolent Association and had opposed the Cuyahoga County Warden in the past. Additionally, Sunquist's counsel responded that he excluded juror 18 because (1) he had one child currently incarcerated and another formerly incarcerated; (2) he was alleged to have assaulted a child in his care; and (3) he stated that he did not know whether these circumstances would impact his ability to be fair and impartial. These explanations were race neutral. *See Purkett*, 514 U.S. at 768 ("Unless a discriminatory intent is inherent in the [strike proponent's] explanation, the reason offered will be deemed race neutral." (quoting *Hernandez*, 500 U.S. at 360 (plurality opinion)).

Hunt maintains that these explanations were pretextual. Specifically, he argues that: (1) the strikes show a pattern targeting African American jurors resulting in no African American jurors on the final jury; (2) Ashcraft's and Sunquist's disparate questioning of these jurors was motivated by discriminatory intent; and (3) similar white jurors were not struck by Ashcraft and Sunquist. Given the deference owed to the district court's findings, we conclude that the district court did not err in overruling the *Batson* objections. While Hunt demonstrated that Sunquist and Ashcraft eliminated all African American panelists, a pattern of strikes targeting African American jurors giving rise to an inference of discrimination, that pattern alone is insufficient to support a finding

9

of discrimination under a totality of the circumstances analysis. Meanwhile, because there were meaningful and significant differences between the struck jurors and nonstruck jurors, Hunt's comparative analysis fails to overcome Sunquest and Ashcraft's race-neutral justifications. Accordingly, we decline to disturb the district court's decision overruling Hunt's motion.

First, Hunt highlights that all four of the African American jurors in the venire were removed, one juror for cause and the three jurors at issue as a result of the defendants' preemptory strikes. The pattern of eliminating all African American jurors from the final jury, he argues, shows that Ashcraft and Sunquist "were motivated in substantial part by discriminatory intent." CA6 R. 18, Appellant Br., PageID 23.

A situation where "the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury" can give rise to an inference of discrimination. *United States v. Carter*, 483 F. App'x 70, 73 (6th Cir. 2012) (quoting *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521–22 (6th Cir. 1988)); *Drain*, 595 F. App'x at 571 (6th Cir. 2014). Here four out of twenty-seven of the potential jurors in the venire were African American. The final eight-member jury contained no African American jurors. The Supreme Court has found similar percentages of struck jurors to support a showing of discrimination. *See, e.g.*, *Flowers*, 139 S. Ct. at 2246 (five of six African American jurors were struck); *Snyder*, 552 U.S. at 475–76 (all five African American jurors were struck); *Miller-El*, 545 U.S. at 240–41 (ten of eleven African American jurors were struck); *Batson*, 476 U.S. at 83 (all four African American jurors were struck); *see also Drain*, 595 F. App'x at 571 (seven of nine African American jurors were struck). Such a "'pattern' of strikes against black jurors" gives rise to an inference of discrimination. *Batson*, 476 U.S. at 97.

Hunt also argues that a comparative analysis of the struck jurors shows that Ashcraft and Sunquist's neutral justifications for striking the jurors were pretextual. "If a [party's] proffered reason for striking a black panelist equally applies to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *United States v. Odeneal*, 517 F.3d 406, 420 (6th Cir. 2008) (quoting *Miller-El*, 545 U.S. at 241). Such "unexplained disparate treatment" can establish that a party's race neutral reason was pretext. *Id.* "[I]t is not necessary to show that the excluded venire panelist was similarly situated to a white potential juror in all respects." *United States v. Torres-Ramos*, 536 F.3d 542, 559 (6th Cir 2008).

a.

Sunquist's counsel explained that he excluded juror 7 because (1) her uncle was the former Warden of the Cuyahoga County jail; (2) she equivocated on whether she could be impartial; and (3) Sunquist's attorney represented correctional officers through the Ohio Patrolman's Benevolent Association, an organization that has opposed the Cuyahoga County Warden in the past. Hunt argues that this explanation was pretextual. Specifically, he reasons that Sunquist's counsel asked no follow-up questions of juror 7 during voir dire about her relationship with her uncle, the former Warden of the Cuyahoga County jail, or her knowledge of the Ohio Patrolman's Benevolent Association; failed to ask any follow-up questions about whether she could be impartial; and other jurors had similar connections to law enforcement but were not struck.

Hunt argues that Sunquist's counsel's argument that juror 7 was struck because her uncle was a warden is pretext because other jurors with family members in law enforcement were not struck. Other jurors in the venire had family members that were police officers, code enforcers, and police auxiliary. Hunt's framing is misleading. Sunquist's counsel's concern was not that juror 7's uncle was in law enforcement, but rather that her uncle was himself facing allegations of

11

inmate mistreatment. No other juror had a family member that worked in a correctional facility, much less one facing allegations akin to those at issue in the trial.

Second, Sunquist's counsel relied on the fact that juror 7 "equivocat[ed]" on whether or not she could be impartial. DE 109, Trial Tr., PageID 1549–50. During voir dire, the district court asked, "Has anyone had any experience in their personal life or the personal life of any member of your immediate family that you believe could influence your judgment as a fair and impartial juror?" *Id.* at 1529. Juror 7 stated that her uncle, the warden, "[wa]s in trial right now" relating to allegations of concealing evidence in inmate suicide cases. *Id.* at 1529–30. The district court followed up, asking if juror 7 "believe[d] that might have an impact on [her] ability to be fair and impartial in this case?" *Id.* at 1530. Juror 7 responded "Yeah, because it wasn't fair." *Id.*

Hunt faults Sunquist's counsel for not asking a follow up question to clarify juror 7's ability to be impartial and fair. Indeed "[t]he failure of [a party] to inquire regarding a reason purported to be a basis for a juror's dismissal serves as evidence of discrimination." *Odeneal*, 517 F.3d at 421. "[F]ailing to ask follow-up questions can undercut the persuasiveness of the averred concern." *Russell v. Bunting*, 722 F. App'x 539, 548 (6th Cir. 2018) (citing *Miller-El,* 545 U.S. at 250 n.8). If Sunquist's counsel "been truly concerned" about juror 7's ability to be fair and impartial we expect him to "clear[] up any misunderstanding by asking further questions before getting to the point of exercising a strike." *Odeneal*, 517 F.3d at 420–21.

Undercutting this inference, however, is the fact that Sunquist and Ashcraft also struck other jurors who similarly equivocated on whether they could be impartial and fair. Sunquist's counsel used the same reason to justify striking juror 18. Counsel also asked follow-up questions to jurors 3, 13, 14, and 18 about their ability to be fair and impartial signaling that this was an important issue. Although Sunquist's counsel failed to follow up with juror 7, her response to the

voir dire question more clearly indicated that her uncle's ongoing litigation would impact her ability to be fair and impartial reducing the need for further clarification.

Finally, although Sunquist's counsel did not ask juror 7 any questions about the Ohio Patrolman's Benevolent Association, her familiarity or knowledge of the organization, or understanding of the relationship between the organization and her uncle as Warden, Sunquist's counsel explained that he struck juror 7 because of his representation of the organization. Although Sunquist's counsel declined to question juror 7 about her knowledge of the organization, Sunquist's counsel had a legitimate interest in eliminating even the potential of conflict and chose to expeditiously strike juror 7 rather than risk this conflict.

The district court's finding that Hunt did not meet his burden to prove the strike was motivated by discrimination was not clearly erroneous.

b.

Hunt also challenged the preemptory strike of juror 17. Ashcraft's counsel explained that juror 17 worked as a contract nurse in the Cuyahoga County jail and counsel "didn't want her to bring her preconceived notions to the rest of the jury." DE 109, Trial Tr., PageID 1551. Hunt claims that this reason is pretextual because Ashcraft's counsel failed to ask any follow-up questions of juror 17 to determine whether she had any "preconceived notions" and Ashcraft did not strike juror 22 who also had experience in a correctional facility.

Ashcraft's counsel declined to ask any follow-up questions to juror 17 about her employment. Hunt argues that "if Defendants were truly concerned about . . . the possible existence of preconceived notions by Juror 17, they 'would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.'" CA6 R. 18, Appellant Br., PageID 28 (quoting *Odeneal*, 517 F.3d at 421). Although Ashcraft's counsel's

failure to fully investigate juror 17's "preconceived notions" could have been a sign of pretext, juror 17's experience as a contract nurse in a jail setting provided her a greater familiarity with correctional officers' uses of force and other jails' policies and procedures than other jurors. Ashcraft's counsel might understandably want the jury's understanding of the use of force in jail to come exclusively from trial. And, if so, no additional questions of juror 17 were required to determine she should be struck.

Furthermore, Hunt's comparison of juror 17 to juror 22 fails to demonstrate discriminatory intent. Juror 22 was employed as a therapist at a juvenile center. Juror 17 was formerly employed as a nurse at the Cleveland city jail and the Cuyahoga County jail and, as part of her job, treated prisoners who had been in altercations with other prisoners or correctional officers. Although both jurors had experience in a correctional setting, juror 17's experience treating physical injuries of adult prisoners meaningfully differentiates her from juror 22 who treated the mental health of juveniles. *See United States v. Simon*, 422 F. App'x 489, 494–95 (6th Cir. 2011) (concluding that two jurors were meaningfully different, although both jurors had a high school education and were unemployed, when one juror attended beauty school and left her position as an owner of a salon to be a stay at home parent and the other juror was a laid off factory worker); *United States v. McAllister*, 531 F. App'x 593, 595–96 (6th Cir. 2013) (concluding that there was a meaningful difference between an unemployed juror and another juror who was an "assumed homemaker/self-employed"). Although Hunt argues that other white nurses in the venire were not struck, Ashcraft's reason for the strike was not juror 17's employment as a nurse, but rather her experience working in a jail setting. The only juror with any related employment at a correctional facility was juror 22. Given the meaningful differences in juror 17 and juror 22's employment, Ashcraft's

14

counsel's failure to investigate juror 17's employment alone cannot carry Hunt's burden to prove Ashcraft's explanation for striking juror 17 was pretextual.

c.

Last, Sunquist's counsel responded that he excluded juror 18 because (1) he had one child currently incarcerated and another formerly incarcerated; (2) he was alleged to have assaulted a child in his care; and (3) he stated that he did not know whether these circumstances would impact his ability to be fair and impartial. Hunt argues that these reasons are pretextual because other jurors had incarcerated family members, were involved in civil suits, and expressed similar concerns about their ability to be fair and impartial.

Sunquist counsel's first reason for striking juror 18 was that he had a son currently incarcerated for assault and another son who was previously incarcerated. Although other jurors had family members formerly incarcerated, only juror 3 had a family member currently incarcerated. Juror 3's brother-in-law was incarcerated on a murder sentence. A key difference between juror 3 and juror 18, however, is that juror 3 stated that his brother-in-law had not experienced any problems with correctional officers and nothing about the experience would prevent him from being fair and impartial. In contrast, juror 18 did not know whether his son had any difficulties with correctional officers and didn't know if he could be fair and impartial in this case. Additionally, Sunquist's counsel's explanation focused on the parent-child relationship, not a general familial relation. The meaningful differences between jurors 18 and 3 counsel against an inference of discrimination.

Next, Sunquist's counsel expressed concern that juror 18 had "assaulted a child that was within his care or within his responsibility." DE 109, Trial Tr., PageID 1550. Hunt attempts to characterize this explanation as expressing concern about a juror's "involvement in a civil suit"

15

and seeks to compares juror 18 to juror 19 who was also involved in a civil suit. CA6 R. 18, Appellant Br., PageID 37. Although a *Batson* challenger "is not required to identify an *identical* white juror for the side-by-side comparison," *Flowers*, 139 S. Ct. at 2249, the differences must not be "significant," *United States v. Atkins*, 843 F.3d 625, 632 (6th Cir. 2016), or "meaningful," *Simon*, 422 F. App'x at 495. Here the differences in the "civil suits" between jurors 19 and 18 are significant. Juror 19 "sued the Chrysler car company in 2003." DE 109, Trial Tr., PageID 1502. This civil suit is easily distinguishable from the suit against juror 18 by Christian Family Outreach for allegedly improperly restraining a child so that child "got hurt." DE 109, Trial Tr., PageID 1502, 1504–05. Juror 18's civil suit involved conduct similar to the alleged conduct—excessive force against an individual in the defendant's care—while the events underlying Juror 19's suit bore no resemblance to Hunt's suit. Although both situations involved civil cases that settled, the meaningful factual difference in the cases does not permit an inference of discrimination.

Sunquist's counsel's last explanation was that Juror 18 equivocated on whether he could be impartial. During the district court's questioning, juror 18 explained that one son was currently incarcerated and another son had spent a month in jail, and, in response to the district court's question if anything about his son's experience or juror 18's experience with his son would prevent him from being fair in impartial, juror 18 stated "I don't know." *Id.* at 1513. After the district court finished the initial questions, counsel asked juror 18 more specifically about his ability to be impartial. Sunquist's counsel asked: "Given your experience, your life experience here, do you think you could be completely fair and impartial on this case and just take all the evidence that came in without letting that life experience affect it?" *Id.* at 1536. Juror 18 responded, "I don't know. I can't answer that now." *Id.* This follow up question suggests that this was an important

consideration in determining whether to strike juror 18 and the record supports the explanation that juror 18 equivocated on whether he could be fair and impartial.

We are not left with a "definite and firm conviction that a mistake has been committed." *Atkins*, 843 F.3d at 632 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985)). The district court did not clearly err in overruling Hunt's *Batson* challenge to juror 18.

* * *

The district court credited the attorneys' explanations for striking jurors 7, 17, and 18. The totality of the evidence supports the district court's finding that Hunt failed to meet his burden to prove that defense counsels' explanations for using their preemptory strikes were pretextual.

B.

Hunt argues that the district court erred in granting Ashcraft's motion for judgment as a matter of law on his failure to intervene claim. Hunt recognizes, however, that this argument is contingent on his *Batson* claims. If no excessive force was used, Ashcraft cannot be responsible for failing to intervene. *See, e.g.*, *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (stating the elements of the claim); *Simmons v. Napier*, 626 F. App'x 129, 139 (6th Cir. 2015) (noting that the plaintiff could not have succeeded on a failure to intervene claim because "the jury's verdict established that there was no conduct that any of the defendant officers had the obligation to stop or prevent, and [the defendants therefore] simply could not have been found liable for failing to prevent unlawful conduct that did not occur"). Here, the jury found that Sunquist did not use excessive force. Because we conclude that the district court did not err in overruling Hunt's *Batson* claim, Hunt's failure to intervene argument necessarily fails.

III.

We affirm the judgment of the district court.