RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0285p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 16-5531

GEREMY ATKINS,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:15-cr-20019—John Thomas Fowlkes, Jr., District Judge.

Argued: December 1, 2016

Decided and Filed: December 13, 2016

Before: MOORE and CLAY, Circuit Judges; HOOD, District Judge.[*]

---

### COUNSEL

---

**ARGUED:** Unam Peter Oh, FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. Elizabeth Rogers, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Unam Peter Oh, FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. Elizabeth Rogers, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

---

### OPINION

---

CLAY, Circuit Judge. Defendant Geremy Atkins appeals from the judgment of conviction and sentence entered by the district court on April 21, 2016 after a jury found

---

[*]The Honorable Joseph M. Hood, Senior District Judge of the United States District Court for the Eastern District of Kentucky, sitting by designation.

1

Defendant guilty of one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On appeal, Defendant argues that his conviction is tainted because the government violated the Equal Protection Clause and *Batson v. Kentucky*, 476 U.S. 79 (1986) by striking a black venireperson for racially motivated reasons during jury selection for Defendant's trial. We have jurisdiction to entertain this appeal pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we **REVERSE** the district court's denial of Defendant's *Batson* challenge, **VACATE** Defendant's conviction and sentence, and **REMAND** for a new trial.

## BACKGROUND

The relevant facts of this case are undisputed. Defendant is a 32-year-old black man from the Memphis, Tennessee area. He has prior state court convictions for unlawful possession of a weapon, resisting arrest, and possession of a prohibited weapon. On September 4, 2014, Defendant was arrested by the Memphis Police Department for possession of an assault rifle. On January 29, 2015, a federal grand jury indicted Defendant in the Western District of Tennessee for being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Defendant elected to proceed to trial.

Trial began on January 11, 2016. At the beginning of the jury selection process, the district court explained to Defendant and the government how it intended to conduct *voir dire*:

THE COURT: I will ask [the prospective jurors] general information first, just verifying their place of employment, basically what they do, how long they've worked there. I usually go into if they are in a supervisory position or anything like that.

I also verify that they still live in the district. I won't ask any addresses or anything like that. I will get their marital status and number of kids. I usually limit it to that once they're in the box.

Both sides will have an opportunity to question the panel.

. . .

After that, peremptory challenges, I think you have sheets and then pass them forward to me and I will read the names and we will proceed in that fashion.

(R. 79, *Voir Dire* Transcript, PageID #169–70.) The district court notified the prospective jurors that the trial would last approximately three days, based on the information it had gathered from Defendant and the government.

The district court conducted *voir dire* in accordance with its instruction to the parties, asking each prospective juror for one year of employment history, as well as their marital status and how many children they had. Both parties were given the opportunity to ask questions of each prospective juror before deciding whether to exercise their peremptory strikes. The district court ultimately seated white jurors Jimmy Stewart, who had six children, Sarah Williams, who had four children, and Jennifer Absher, who had been laid off from her job approximately one month before *voir dire* began.[1]

During *voir dire*, the government used peremptory strikes on five prospective jurors—all of whom were black. The last of these prospective jurors was Antonio Dandridge. When questioned by the district court, Mr. Dandridge reported that he was married and had eight children. Mr. Dandridge also stated that: (i) he worked as a custodian for a company called Service Master; (ii) he had begun working for Service Master four months prior to *voir dire*; and (iii) before working at Service Master, he had worked as a cook at a Krispy Kreme donut shop for the previous year. In response to a question from the government, Mr. Dandridge stated that his nephew was a Memphis police officer.

After the government struck Mr. Dandridge, Defendant brought a *Batson* challenge, alleging that the government's use of strikes exclusively on black venirepersons violated the Equal Protection Clause. The district court determined that Defendant had made a *prima facie* showing of discrimination and shifted the burden to the government to come forward with race-neutral reasons for the strike. The government offered race-neutral reasons as to each of the five black venirepersons it had stricken. With respect to Mr. Dandridge, the government offered:

---

[1]The record does not disclose the race of any of the jurors who were ultimately seated at Defendant's trial. At oral argument, we asked Defendant's counsel to specify the races of Mr. Stewart, Ms. Williams, and Ms. Absher, and counsel informed us that they are all Caucasian. The government did not contest this representation.

MR. CARRIKER: Mr. Dandridge -- Mr. Dandridge is just one of those people that I didn't get a good feeling about. He didn't have a very long employment history, which I don't usually like. I prefer people that have a stable background. He has eight children which kind of also bugged me a little bit. I'm afraid he might have problems with thinking about his child care or children while he was here. And so that was just a peremptory challenge based on those reasons.

(*Id.* PageID #330–31.)

The district court determined that the government had met its burden to provide race-neutral reasons for the strike and shifted the burden back to Defendant to show that the government's reasons were pretextual. Defendant argued that Mr. Dandridge's child care would not be an issue because he was married, and pointed once again to the fact that all five of the government's peremptory strikes were used on black prospective jurors. Defendant also argued that the district court only asked for one year's worth of work history from each prospective juror, and that Defendant's continuous work history over that span was "fairly good . . . not poor." (*Id.* PageID #333.) In response to Defendant's argument, the government argued:

MR. CARRIKER: Mr. Dandridge, he has eight children. He has worked for Service Master for four months and he was at Krispy Kreme for I believe he said maybe up to a year before that. That's not a very good work history as far as being stable, changing jobs, four months in, eight children. I was concerned about his ability to focus on the case at hand and listen and be attentive in a trial.

(*Id.* PageID #332.)

The district court denied Defendant's *Batson* challenge, reasoning that the government's employment justification was not pretextual:

THE COURT: I will allow lawyers obviously to follow-up on things, and it does seem to me that it is a sufficient answer with regard to Mr. Dandridge and his work history given everything else about him.

So race neutral reasons as far as the challenges are concerned, from what I have heard here, I'm going to have to deny the challenge.

(*Id.* PageID #333–34.)

Defendant was convicted at trial and sentenced to thirty-seven months in prison. The district court entered judgment on April 21, 2016. Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant argues that the district court erred at step three of the *Batson* inquiry when it determined that the government's race-neutral explanations for striking Mr. Dandridge were not pretexts for improper racial discrimination. After a thorough review of the record and relevant case law, we agree.

## I.      Applicable Legal Principles

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). The Supreme Court's decision in *Batson v. Kentucky* "established [a] three-part process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause." *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003). "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Id.* "Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question." *Id.* "Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Id.* at 328–29.

Here, the parties do not contest that Defendant made a *prima facie* showing of discriminatory purpose, and that the government responded with race-neutral reasons justifying its strike of Mr. Dandridge. Accordingly, we will proceed directly to *Batson* step three. *See Foster*, 136 S. Ct. at 1747.

"[D]istrict courts must conduct a *Batson* inquiry 'in light of all evidence with a bearing on it.'" *United States v. Torres-Ramos*, 536 F.3d 542, 560 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 251–52 (2005)). "[T]his command places an affirmative duty on the district court to examine the relevant evidence that is easily available to a trial judge before

ruling on a *Batson* challenge." *Id.*; *see also Snyder*, 552 U.S. at 478 ("[I]n considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted."). At *Batson* step three, "the trial court must assess the plausibility and persuasiveness of the proffered race-neutral explanation based on the totality of the evidence before" it. *United States v. Odeneal*, 517 F.3d 406, 419 (6th Cir. 2008). "Although the trial court must decide the question of discriminatory intent, 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

"It is well established that a *Batson* violation may be shown by disparate treatment of white and minority jurors—that is, if a 'side-by-side comparison[] of some black [potential jurors] who were struck and white ones who were not' shows that the only material distinction between the removed black and the retained white individuals is their race." *Torres-Ramos*, 536 F.3d at 559 (second alteration in original) (quoting *Dretke*, 545 U.S. at 241). In conducting a comparative juror analysis, the compared jurors need not be "'similarly situated' in all respects." *Odeneal*, 517 F.3d at 420. In fact, the empaneled white jurors need not even match the stricken black venirepersons in all of the characteristics the prosecution identified in striking the black venirepersons. *Dretke*, 545 U.S. at 247 n.6. It suffices that, after reading the "*voir dire* testimony in its entirety," we find that the differences identified by the prosecution "seem far from significant." *Id.* at 247. Additionally, the "failure of the prosecution to inquire regarding a reason purported to be a basis for a [prospective] juror's dismissal serves as evidence of discrimination." *Odeneal*, 517 F.3d at 421.

## II.　　Standard of Review

At the outset, we must determine which standard of review governs this appeal. Defendant primarily seeks to demonstrate that the government's race-neutral justifications for striking Mr. Dandridge were pretextual by showing that the government did not express the same concerns about similarly situated white venirepersons who ultimately served on the jury. This species of argument is often referred to as a comparative juror analysis, and we will use that term hereafter. Defendant argues that the appeal raises purely legal issues, and thus our review should be *de novo*. By contrast, the government argues that Defendant failed to offer a comparative

juror analysis before the district court, and that plain error review should therefore apply. As we will explain, neither party is correct, and we hold that clear error review is appropriate.

"On direct review" of a *Batson* challenge, "'the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal' and will not be overturned unless clearly erroneous." *Odeneal*, 517 F.3d at 419 (quoting *Hernandez v. New York*, 500 U.S. 352, 364 (1991) (plurality opinion)). A "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Under this standard, if "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

"However, when ruling on alleged mistakes of law" in a *Batson* challenge, "the applicable standard of review is essentially *de novo*." *United States v. Cecil*, 615 F.3d 678, 686 (6th Cir. 2010); *see also United States v. Kimbrel*, 532 F.3d 461, 465–66 (6th Cir. 2008) ("Because this argument concerns an alleged mistake of law, it makes no difference whether we review this *Batson* challenge for clear error . . . or review it de novo. In either event, a mistake of law generally satisfies clear-error, de-novo or for that matter abuse-of-discretion review.").

When a party fails to raise an argument before the district court, the argument may generally only be reviewed for plain error on appeal. Fed. R. Crim. P. 52(b). The Supreme Court has explained that plain error review "involves four steps." *Puckett v. United States*, 556 U.S. 129, 135 (2009). "First, there must be an error or defect—some sort of '[d]eviation from a legal rule'—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant." *Id.* (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 732–33 (1993)). "Second, the legal error must be clear or obvious, rather than subject to reasonable dispute." *Id.* "Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district

court proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 734). "Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (alteration in original) (quoting *Olano*, 507 U.S. at 736).

Here, as noted earlier, the parties disagree as to which standard of review applies. Defendant contends that clear error or *de novo* review should apply—and that it does not matter which the Court chooses, because the district court committed a legal error, and "a mistake of law generally satisfies clear-error, de-novo or for that matter abuse-of-discretion review," *Kimbrel*, 532 F.3d at 465–66. The government argues that plain error review should apply because Defendant failed to request that the district court conduct a comparative juror analysis when he raised his *Batson* challenge.

Both parties are incorrect. Both the Supreme Court and this Court have held that the trial court's ultimate decision at *Batson* step three as to whether the government had an "intent to discriminate" is "a pure issue of fact" that demands clear error review. *Hernandez*, 500 U.S. at 364; *Cockrell*, 537 U.S. at 339; *Odeneal*, 517 F.3d at 419. Defendant is squarely challenging the district court's finding at *Batson* step three that the government lacked intent to discriminate when it struck Mr. Dandridge. Therefore, because the ultimate issue before us is factual, rather than legal in nature, *de novo* review is inappropriate.

But the government's argument for plain error review also misses the mark. "Ordinarily, the courts of appeals do not consider claims *or arguments* that were not raised in the district court." *United States v. Hayes*, 218 F.3d 615, 619–20 (6th Cir. 2000) (emphasis added). However, in *Dretke*, the Supreme Court held on habeas review that the prosecution's use of peremptory strikes violated the Equal Protection Clause after conducting a comparative juror analysis. 545 U.S. at 241. The dissenting Justices argued that the comparative juror analysis was inappropriate because the defendant never argued for such an analysis before the state trial court. *Id.* at 279–280 (Thomas, J., dissenting). The Court rejected this argument:

The dissent contends that comparisons of black and nonblack venire panelists, along with Miller-El's arguments about the prosecution's disparate questioning of black and nonblack panelists and its use of jury shuffles, are not properly before this Court, not having been "put before the Texas courts." *Post*, at 2347 (opinion of THOMAS, J.). But the dissent conflates the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence. See 28 U.S.C. § 2254(d)(2) (state-court factfinding must be assessed "in light of the evidence presented in the State court proceeding"); *Miller-El v. Cockrell, supra,* at 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (habeas petitioner must show unreasonability "in light of the record before the [state] court"). There can be no question that the transcript of *voir dire,* recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state courts, nor does the dissent contend that Miller-El did not "fairly presen[t]" his *Batson* claim to the state courts. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

*Id.* at 241 n.2; *see also Kesser v. Cambra*, 465 F.3d 351, 361 (9th Cir. 2006) (en banc) (holding that comparative juror analysis argument is not waived on appeal "even when it was not requested or attempted in the [trial] court" and that all that is required to preserve the argument for appellate review is "a transcript of voir dire and a *Batson* claim fairly presented").

Although *Dretke*'s analysis occurred in the context of habeas proceedings, we see no reason why its reasoning should not apply with equal force under the more expansive appellate review afforded in a direct appeal from a district court. Accordingly, we hold that because we possess a transcript of *voir dire*, and Defendant fairly presented his *Batson* claim to the district court, he has not waived the right to offer a comparative juror analysis on appeal. *Dretke*, 545 U.S. at 241 n.2; *Kesser*, 465 F.3d at 361. We will therefore decline to apply plain error review, and instead use the clear error standard that generally applies when we review a district court's decision at *Batson* step three.**[2]** *Hernandez,* 500 U.S. at 364; *Odeneal*, 517 F.3d at 419.

---

**[2]**In any event, it would not matter if we applied plain error review, because there is no practical difference between clear error and plain error review in this context. Ordinarily, "the clear error standard is easier to satisfy [than plain error] because a party does not have to prove that the error affected substantial rights or the fairness, integrity, or reputation of the judicial proceeding." *Dupree v. Warden*, 715 F.3d 1295, 1301 (11th Cir. 2013). However, *Batson* error is a structural error that commands automatic reversal, obviating the need to show that the error affects a defendant's substantial rights. *United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012) (holding that when the district court commits a *Batson* error "the defendant is not required to show that the putative error affected his substantial rights"). "Moreover, *Batson* errors represent a violation of the right to equal protection of the laws, which itself does damage to the fairness, integrity, and public reputation of the judicial proceeding." *Id.*; *see also United States v. Harris*, 192 F.3d 580, 587–88 (6th Cir. 1999) (The "harm inherent in a discriminatorily

## III.    Analysis

### A.    Appropriateness of a Comparative Juror Analysis

Defendant argues that a comparison of empaneled white jurors and Mr. Dandridge shows that the government's race-neutral justifications for striking Mr. Dandridge were pretextual. The government counters by arguing that the district court did not err by failing to *sua sponte* conduct a comparative juror analysis, and that it would be inappropriate for us to conduct such an analysis on a cold appellate record. Accordingly, a threshold issue is whether we may properly consider Defendant's arguments in light of the record before us.

To begin with, the government is correct that the district court's failure to conduct its own comparative juror analysis is not sufficient to require reversal. In *Cecil*, we held that "[i]f neither party argues for [a comparative juror] analysis to prove or disprove purposeful discrimination, the district court's failure to undertake it is not necessarily reversible error." *Cecil*, 615 F.3d at 687; *see also McDaniels v. Kirkland*, 813 F.3d 770, 776 (9th Cir. 2015) (rejecting the argument that a trial "court *must* conduct comparative juror analysis" under *Batson* step three (emphasis in original)). We have also suggested in dicta that we are not required to conduct a comparative juror analysis when one was not conducted before the district court. *See Mahbub*, 818 F.3d at 229 ("In any event, our case law explains that this court is by no means compelled to conduct a comparative juror analysis when a defendant failed to preserve the issue.").

Whether we may *elect* to conduct a comparative juror analysis here is a subtler question. In *Snyder v. Louisiana*, the Supreme Court commented briefly on the appropriateness of conducting a comparative juror analysis for the first time on appellate review:

> We recognize that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in

---

chosen jury inures not only to the defendant, but also to the jurors not selected because of their race, and to the integrity of the judicial system as a whole."). Accordingly, since the two elements of plain error review that differ from clear error review are *automatically* satisfied if we find a *Batson* error, our analysis would not change in any respect if we applied plain error review. *See United States v. Mahbub*, 818 F.3d 213, 223–24 (6th Cir. 2016).

question were not really comparable. In this case, however, the shared characteristic, *i.e.,* concern about serving on the jury due to conflicting obligations, was thoroughly explored by the trial court when the relevant jurors asked to be excused for cause.

*Snyder*, 552 U.S. at 483. As we have recently noted, beyond "this statement . . . the Supreme Court did not provide any additional guidance as to when it would be proper for an appellate court to conduct a comparative juror analysis when the parties did not raise the alleged similarities between prospective jurors before the district court. Nor is it clear from the Supreme Court's opinion as to what constitutes a 'thorough[] explor[ation]' of a particular issue." *Mahbub*, 818 F.3d at 229 (alterations in original) (quoting *Snyder*, 552 U.S. at 483).

The government argues that conducting a comparative juror analysis here would be inappropriate because there was not a sufficiently "thorough exploration of the employment and child care issues of either Mr. Dandridge or the white jurors" before the district court. (App. R. 10, Opposition Brief, at 15.) We disagree.

In *Snyder*, the prosecutor purported to strike a black venireperson who needed to complete a certain number of student-teaching hours in order to obtain his graduate degree because the prosecutor feared that the venireperson would be motivated to find the defendant guilty of a lesser included charge, instead of capital murder, in order to skip the trial's penalty phase. 552 U.S. at 482. The Supreme Court held that the prosecutor's strike violated *Batson*, relying in part on a comparative juror analysis that was not developed before the trial court. *Id.* at 483. Specifically, the Court noted that an empaneled white juror appeared to have significantly more pressing time constraints, including looming professional obligations and a need to be available to care for his children because of his wife's recent surgery. *Id.* at 483–84. The Court explained that its comparative juror analysis was proper because "the shared characteristic, *i.e.*, concern about serving on the jury due to conflicting obligations, was thoroughly explored by the trial court when the relevant jurors asked to be excused for cause." *Id.* at 483.

Similarly, in *Dretke*, the Supreme Court granted relief based in part on a comparative juror analysis not developed before the trial court. 545 U.S. at 242. There, the prosecution

justified its strike of a black venireperson because the prosecutor believed that the venireperson would not impose the death penalty if rehabilitation was possible. *Id.* at 244. In holding that the prosecution's race-neutral justification was pretextual, the Court noted that several white panel members made similar statements about the death penalty and rehabilitation, and the prosecutor did not even question those panel members further. *Id.* Although the Court did not explain why the record was sufficiently developed to permit a comparative juror analysis, the Court suggested that the *voir dire* transcript, which recorded the prospective jurors' views on the death penalty, was sufficient to permit appellate review. *Id.* at 241 n.2.

The lesson we draw from *Snyder* and *Dretke* is that it is appropriate to conduct a comparative juror analysis for the first time on appeal when: (i) the government purportedly strikes a venireperson because of an answer to a question posed during *voir dire*; (ii) venirepersons relevant to the comparison were asked the same question during *voir dire*; (iii) the relevant venirepersons actually answered that question in similar depth; and (iv) the purpose of the analysis is to show that the government treated jurors with similar answers differently. These factors will most often be present when venirepersons are asked a common question going to their basic fitness to serve as jurors, such as whether conflicting obligations would prevent them from focusing on the trial, *see Snyder*, 552 U.S. at 482–84, or whether their moral or philosophical beliefs would prevent them from appropriately following the district court's legal instructions, *see Dretke*, 545 U.S. at 244. This is because the parties and the district court always have a powerful incentive to thoroughly explore the fitness of jurors in order to insure that the parties receive a fair trial. Thus, when these four factors are present, the Supreme Court's concerns in *Snyder* about drawing specious comparisons on a cold appellate record will rarely be implicated, because the basis for comparison will usually have been "thoroughly explored." *See Snyder*, 552 U.S. at 483.

Applying these principles here, we hold that the record before us is sufficient to conduct a fair comparative juror analysis. During *voir dire*, the district court asked each venireperson to give his or her employment history for the last year and to disclose how many children they had. The government justified striking Mr. Dandridge because he had changed jobs four months prior and had eight children; the government was purportedly "concerned about his ability to focus on

the case at hand and listen and be attentive in a trial." (R. 79, PageID #332.)  The government did not delve deeper into Mr. Dandridge's answers by, for instance, asking about his child care arrangements, or the reasons he changed jobs.  The government based its strike on the mere fact that Mr. Dandridge had a large family and had changed jobs recently.  Because the record contains this exact same information about each prospective juror—how many children they had and their recent employment history—we can easily evaluate whether the government expressed similar concerns about white empaneled jurors with a large number of children, or that had a recent change in employment status.  As in both *Snyder* and *Dretke*, each of the venirepersons relevant to the comparison—Mr. Dandridge and the empaneled white jurors—were asked on the record about the facts that Defendant seeks to compare.  It is not unfair to the government to evaluate whether it expressed similar concerns about similarly-situated venirepersons.

Finally, we note our agreement with the Ninth Circuit that although "comparative juror analysis [is not] *always* . . . compelled at the appellate level," such "analysis is an important tool that courts *should* use on appeal." *Boyd v. Newland*, 467 F.3d 1139, 1148–49 (9th Cir. 2004) (emphasis in original).  As that court has explained in the context of habeas review:

> We have recognized that "[w]ithout engaging in comparative juror analysis, we are unable to review meaningfully whether the trial court's ruling at either step one or step three of Batson was unreasonable in light of Supreme Court precedent." *Boyd v. Newland*, 467 F.3d 1139, 1149 (9th Cir. 2006) (emphasis added).  That is, in order for *us* to discharge our responsibility under AEDPA to review a *Batson* claim under section 2254(d)(2), we often will have to conduct a formal comparative juror analysis, and our responsibility to conduct a comparative juror analysis is not contingent on whether the state court previously performed or did not perform a formal comparative juror analysis.  When there has been a *Batson* challenge, trial courts are not always situated to stop the proceedings and conduct the kind of formal comparative juror analysis the Court conducted in *Miller-El.*  Often, trial courts are well-situated to decide the question without conducting a formal comparative juror analysis because the trial court has had access to the juror questionnaires and has been intimately involved in the jury selection process.  The trial judge has a front-row seat in the orchestra, making it possible for the trial court to rule quickly on spontaneous *Batson* challenges.  Federal appellate courts are not similarly situated.  From our lofty perch in the loges, where we are separated by time and distance from the proceedings, we must conduct a more formal comparative juror analysis because it is the only means we will have for assessing the state court's factfinding.

*Murray v. Schriro*, 745 F.3d 984, 1005 (9th Cir. 2014).

As Defendant's trial aptly demonstrates, *Batson* challenges are often heard and decided without the formal briefing and motion practice that attends other challenges during a criminal trial. It is clunky and impractical to expect defendants and trial courts to halt proceedings, consult the transcript, and offer a formal comparative juror analysis in the middle of *voir dire*. *See id.* Often, district courts will be well positioned to rule on *Batson* challenges without resorting to a comparison among venirepersons. *See id.* But because we can never be present to observe *voir dire*, a comparative juror analysis will usually be the only tool we have at our disposal to fairly evaluate *Batson* claims. *See id.* We therefore think it best to conduct a comparative juror analysis on appeal whenever the basis for comparison has been sufficiently explored that the analysis will not be unfair to the government. *See Snyder*, 552 U.S. at 483.

**B.    Application**

A thorough review of the record demonstrates that the government's reasons for striking Mr. Dandridge were pretexts for racial discrimination. Three considerations direct us to this conclusion.

First, a comparative juror analysis shows that the government did not express concerns about the ability of similarly-situated white jurors to focus throughout the trial despite their large number of children and inconsistent work history. For instance, empaneled white juror Jimmy Stewart had six children, and alternate white juror Sarah Williams had four children. The government did not question either of these jurors' ability to focus during the trial. Moreover, empaneled white juror Jennifer Absher had been searching for a job for approximately one month before *voir dire* was conducted. The government did not express any concerns that her employment history demonstrated an inability to focus through trial. The government's failure to show the slightest interest in these jurors' family size and employment history suggests that the government's use of these factors with Mr. Dandridge was pretextual. *Dretke*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

Second, the government failed to ask any questions of Mr. Dandridge—or any other juror—about the impact his large family and recent career change would have on his ability to focus at trial. During the *Batson* colloquy, the government explained that Mr. Dandridge's work history and family size left the government "concerned about his ability to focus on the case at hand and listen and be attentive in a trial." (R. 79, PageID #332.) Despite these purported concerns, the government failed to ask obvious follow-up questions that might have confirmed or alleviated the government's suspicions, such as inquiring into Mr. Dandridge's child care arrangements, or the reasons Mr. Dandridge left Krispy Kreme to begin work as a custodian. Asking such questions likely would have revealed highly relevant information such as: (1) whether Mr. Dandridge already had adequate child care arrangements; (2) whether Mr. Dandridge's children were even young enough to need child care at all; and (3) whether Mr. Dandridge left his prior position because of poor performance or lack of attentiveness, or for some more innocuous reason, such as an increase in pay or benefits.[3] The government's disinterest in probing Mr. Dandridge's supposed lack of attentiveness during *voir dire* strongly suggests that the government was not actually concerned with Mr. Dandridge's ability to focus during trial. *See Dretke*, 545 U.S. at 250 n.8 ("[T]he failure to ask [follow-up questions] undermines the persuasiveness of the claimed concern."); *Odeneal*, 517 F.3d at 420–21 ("Moreover, had the prosecutor been truly concerned about juror 194's ability to focus on the proceedings because of her divorce, 'we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.'" (quoting *Dretke*, 545 U.S. at 244)); *United States v. Mahan*, 190 F.3d 416, 425 (6th Cir. 1999) (finding a strike proponent's race-neutral explanation pretextual where proponent did not ask the prospective juror about the purported reasons for the strike).

Finally, read in context, the government's explanations "reek[] of afterthought" and suggest a lack of reasoned consideration in striking Mr. Dandridge. *Dretke*, 545 U.S. at 246. When pressed during the *Batson* colloquy to provide reasons for striking Mr. Dandridge, the

---

[3]The government's failure to ask any follow-up questions about Mr. Dandridge's child care situation is particularly stark on this record. Mr. Dandridge is employed, and his children did not suddenly appear on the eve of trial. He and his wife presumably must have *some* child care arrangements, if such arrangements are indeed required.

government initially said that it simply "didn't get a good feeling about" Mr. Dandridge even though "[t]here [was] nothing overwhelming [sic] horrible about him." (R. 79, PageID #330.) The government continued that Mr. Dandridge "didn't have a very long employment history," stating that it preferred "people that have a stable background." (*Id.*) The government then added that Mr. Dandridge's eight children "bugged [it] a little bit" because it was "afraid he might have problems with thinking about his child care or children" during trial. (*Id.* PageID #330–31.)

The government's reasoning suffers from several logical inconsistencies that cast doubt on the sincerity of its explanations for the strike. To begin with, the district court only asked the prospective jurors for one year of employment history, and so the government did not "have a very long employment history" for many of the prospective jurors. (*Id.* PageID #330-31.) This lack of employment history, which was mostly a function of the questions the district court asked during *voir dire*, did not seem to bother the government with respect to other jurors like Ms. Absher. Moreover, Mr. Dandridge's nephew was a police officer—a fact that often leads *defendants* to strike prospective jurors out of fear that jurors with close ties to police officers are more likely to uncritically believe police witnesses on the stand. *See, e.g.*, *United States v. Thompson*, 528 F.3d 110, 116 (2d Cir. 2008); *Coombs v. Diguglielmo*, 616 F.3d 225, 257–58 (3d Cir. 2010). It is at a minimum odd that the government would strike a juror with law enforcement ties on such flimsy excuses.[4] Finally, as the district court observed, the government only anticipated a three-day trial for the simple, felon-in-possession-of-a-firearm charge facing Defendant. As the Supreme Court observed in *Snyder*, concerns about a juror's ability to focus are generally out of place in short, simple trials. *Snyder*, 552 U.S. at 482 (rejecting prosecutor's justification that stricken juror would have been worried about missing student teaching obligations where "the brevity of petitioner's trial—something that the prosecutor anticipated on the record during *voir dire*—meant that serving on the jury would not have seriously interfered

---

[4]This is not a case where the government struck a venireperson *because* of her ties to law enforcement. *See, e.g.*, *United States v. Cruse*, 805 F.3d 795, 807–08 (7th Cir. 2015) (affirming strike of juror with a police officer brother where "the prosecutor might have plausibly believed that a juror with a close relative on a police force might hold police officers to an especially high standard or have nonrepresentative beliefs about what constitutes good police work"); *Cecil*, 615 F.3d at 688 (affirming strike of juror with a husband in law enforcement where defendant was a former police officer). The government did not mention Mr. Dandridge's police officer nephew in explaining its strike.

with [the venireperson's] ability to complete his required student teaching" (footnote omitted)). Taken together, these considerations suggest that the government had not previously thought through its reasons for striking Mr. Dandridge, which itself suggests that the government's reasons were pretextual "afterthought."

The government does not mount a substantive defense of the strike, but instead argues that Defendant failed to challenge all of the justifications it offered for striking Mr. Dandridge. Specifically, the government claims that it offered a third reason for striking Mr. Dandridge—its subjective feeling that "Mr. Dandridge is just one of those people that [it] didn't get a good feeling about"—and that this third justification is sufficient to sustain the district court's denial of Defendant's *Batson* challenge. (App. R. 10, at 15–16.) While the government is correct that the failure to challenge all of a district court's alternative bases for its decision generally precludes appellate relief, *see, e.g.*, *United States v. Thornton*, 609 F.3d 373, 380 (6th Cir. 2010) (refusing to consider challenge where appellant did not also challenge district court's alternative holding); *White Oak Prop. Dev., LLC v. Wash. Twp.*, 606 F.3d 842, 854 (6th Cir. 2010) (concluding that a party waived its appeal of the district court's dismissal of its claim where appellant failed to address both of the lower court's alternative holdings), the government's specific argument here is foreclosed by *Snyder*.

In *Snyder*, one of the two reasons the prosecutor offered for striking a black venireperson was that the venireperson "looked very nervous . . . throughout the questioning." *Snyder*, 552 U.S. at 478. On appeal, the state argued that this justification was independently sufficient to sustain the strike. *Id.* at 479. The Supreme Court rejected this argument because there was no evidence that the trial court credited the prosecutor's subjective justification:

> With respect to the first reason, the Louisiana Supreme Court was correct that "nervousness cannot be shown from a cold transcript, which is why . . . the [trial] judge's evaluation must be given much deference." 942 So.2d, at 496. As noted above, deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike. Here, however, the record does not show that the trial judge actually made a determination concerning Mr. Brooks' demeanor. The trial judge was given two explanations for the strike. Rather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one

way or the other concerning Mr. Brooks' demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled Mr. Brooks' demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. *For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous.*

*Id.* (alteration in original) (emphasis added).

Here, in explaining why it rejected Defendant's *Batson* challenge, the district court only made reference to the government's employment history justification:

MR. CARRIKER: Mr. Dandridge, he has eight children. He has worked for Service Master for four months and he was at Krispy Kreme for I believe he said maybe up to a year before that. That's not a very good work history as far as being stable, changing jobs, four months in, eight children. I was concerned about his ability to focus on the case at hand and listen and be attentive in a trial.

. . .

THE COURT: I will allow lawyers obviously to follow-up on things, and it does seem to me that it is a sufficient answer with regard to Mr. Dandridge and his work history given everything else about him.

(R. 79, PageID #332–34.) Reading the record charitably in light of the government's justifications, the district court arguably also credited the government's family size justification as part of "everything else about [Mr. Dandridge.]" (*Id.*) There is no indication in the record, however, that the district court credited the government's subjective bad feeling about Mr. Dandridge in upholding the strike. As in *Snyder*, therefore, the government cannot rely on the subjective justification for the purposes of this appeal. *Snyder*, 552 U.S. at 479.

Accordingly, the totality of the evidence before the district court demonstrates that the government's race neutral explanations for striking Mr. Dandridge were pretexts for improper

racial discrimination.  We therefore hold that the district court clearly erred in crediting the government's pretextual justifications, and denying Defendant's *Batson* challenge.**[5]**

## CONCLUSION

We hold that the government violated the Equal Protection Clause by striking Mr. Dandridge on the basis of his race.  Because the district court's decision to uphold the strike was a structural error that tainted the integrity and fairness of Defendant's trial, we **REVERSE** the district court's denial of Defendant's *Batson* challenge, **VACATE** Defendant's conviction and sentence, and **REMAND** for a new trial.

---

**[5]**The government also argues that the district court's judgment should be affirmed because the district court did not improperly collapse steps two and three of the *Batson* inquiry.  *See, e.g.*, *Cecil*, 615 F.3d at 686.  However, Defendant never argued that the district court failed to properly follow the *Batson* framework; he merely argues that the district court's conclusion at *Batson* step three was erroneous.  Accordingly, the government's final argument is irrelevant and nonresponsive.